Good morning, Chief Judge Gregory, Judge Diaz, Judge Wynn. May it please the Court. I'm Shannon Gallagher. I'm the counsel for the appellant, PTA-FLA Inc. With me here today is Joshua Austin, who was the principal writer of the appellant's opening brief and the reply brief. He's a graduate of the University of Virginia, and I hope that's not held against him. Absolutely. It's a fine university in my home state, so absolutely welcome here. Thank you. I'd also like to express my appreciation to the Court. This case was originally scheduled for oral argument about six months ago, and my father passed away the week before we were set for argument, and the Court graciously continued it until this day, so I appreciate that. I also want to recognize the efforts of my opposing counsel, Laura Besmanek, who lives down in the Miami area and has been subject to the hurricane and I think has been displaced since about last Wednesday, as I understand it. She made the supreme effort to be here today and not have to continue this again, so I thank her for that, Your Honor. I think we made our best efforts to address the main issues in the briefs that were filed, and it really comes down to about three main issues, and I'm not sure exactly where the Court's concerns are with respect to those issues. But the first and probably the most important one is one that deals with the question of jurisdiction and the trial court's determination that ZTE Corp. was not subject to the jurisdiction of the court under its analysis of its contacts with the state. And the whole resolution of that issue hinges on the determination by the court of the factual question of who were the parties to the various agreements that were alleged in the pleadings. As the Court's aware, there were three documents that were alleged and one oral agreement, actually two oral agreements, one of which was reneged upon and another one which was re-implemented. But there was the Missouri Agreement, which was the five-page document, and which recites that the contracting parties are Daredevil, the Missouri LLC, and ZTE, Inc. And so that raises the immediate question of, well, who is ZTE, Inc.? Because on the one hand, we've got ZTE Corp., which is the Chinese parent company, and on the other hand, we've got ZTE USA, Inc., which is the domestic subsidiary. Doesn't this really just come down to whether you've got this Missouri Agreement, the MSA, and you've got an addendum, the question being is whether there's sufficient minimum contacts for which you would have personal jurisdiction established? It does come down to that. Are you satisfied the court did enough to be able to determine whether those minimum contacts are there or do you need more discovery? I think, well, it's a matter of discovery. It's also a matter of it being a question of fact. As the Court's aware... You see where I'm going with that? Well, I... It's a matter of discovery, and you need to develop the facts more than we simply send it back and allow for there to be additional discovery as to whether the minimum contacts exist. Well, I certainly think that, number one, I do think that should happen. Number two, the issue is one of the court making a factual determination without an evidentiary hearing. The court. I'm sorry? The court below making it without the hearing. Yes. Yes, clearly, Your Honor. So I think, yes, we're entitled to doing that jurisdictional discovery in the first instance. But also, because even just based on the pleadings that were before the court, there's an issue about, and a factual question about, who are the contracting parties? And was it ZTE Corp.? Was it ZTE USA, Inc.? Was it both of them? And the court took, there's the Missouri Agreement, which consists of five pages, and is replete with references that discuss, here are the ways that we need to bridge the gap between our two countries, which necessarily can only mean that the other party in the case is ZTE Corp., or it talks about the development of hardware or software. And as the court also is aware, ZTE Corp. is the manufacturer of the equipment. ZTE USA is only the sales arm or the local domestic subsidiary that has the salespeople that run out and try to make the sales of the equipment. Well, there are two components to this jurisdictional question, as I understand it. One are the agreements, and then the second part are the claims, the breach of contract claims. So the district court in this case said the agreements suggest that there's no jurisdiction on their face. But even if that's incorrect, the way you fled your breach of contract claim makes it clear that there was absolutely no connection to South Carolina. And at least on the face of it, the breach of contract claim, the two components of that claim that you allege, don't appear to have anything to do with South Carolina. Why is that incorrect? Because I understand the court's comment, and I think that the analysis of the court below, which I think was fed by the position taken by the respondent in this case, and probably really originated with an inartful pleading of the amended complaint in the first instance. One problem led to another, which led to another, which led to another. I wasn't involved in drafting the complaint, and I looked at it as the court did it when I got involved, and I see the reference to Yakima, Washington, and I'm sort of scratching my head about the whole thing as well. And I see the reference to the handset provision, which are the two, when you look at under the heading in the amended complaint, where it talks about breach of contract, those are the two specific references that it makes. But what I think was ignored by ZTE Corp., and either missed or passed over by the court below, is that when you look at the complaint in its totality, it specifically addresses conduct that was supposed to happen in the state of South Carolina. And specifically, paragraphs 39 through 52 of the amended complaint talk about the delivery of the additional base stations in South Carolina. And all the elements are there. It says, paragraph 39 says, hey, there was a contract. And when we look at the addendum, the page and a little bit more that flows over, the addendum specifically addresses that ZTE Corp. is going to deliver additional base stations to one of four locations. And one of those locations is South Carolina. So we've got a contract that says base stations are going to be delivered in South Carolina. The other allegations for you. One of four. I'm sorry? One of four places. I believe it's one of four, Your Honor. It's certainly South Carolina was one of them. And so when the contract is required to be done in South Carolina. I'm sorry? Is it required, or is this just an option? Well, it says, it's agreed the customer can request ZTE to deliver base stations within a reasonable time to any of customers' owned markets, including the Carolinas, Jackson, Tennessee, Yakima, Washington, and Hotel Idaho. So it was specifically contemplated by the parties when they signed the addendum that ZTE would be delivering. Not would, could. Well, it certainly could be. That's the big difference. It could, but not would. Well, certainly the possibility existed that the customer sent all of them to Yakima or Jackson, Tennessee or someplace like that. But the critical point is that ZTE Corp. took on the obligation when it signed the addendum and said, we will agree to ship goods to South Carolina if that's where you tell us to ship them. And that's where you want to implement it. If. You got could, now you got could, and now if. Give me the definite. It's not definite. That's the whole idea of the due process aspect of minimal contact. It says it could be South Carolina. And if this happens, we are willing to do so. But, I mean, it's the four corners. It's the agreement and your complaint. As Judge Diaz asked the question, I think you're still trying to answer his question. But your answer is bringing the obvious problems of would and if. Well, it's clear from the agreement that ZTE Corp. took on the obligation to ship them to the location specified by the client. Right. And if whatever they might be. I'm sorry? Whatever they might be. Sure, sure. It could be any state, correct? Sure. And. So, I mean, you have minimal contacts in every state in the country because they could require to be shipped there? Your Honor, I believe it does. I think if a contracting party says, I will agree to ship my goods to whatever state you tell me to, and they know that that's where they're going to go, then, yes, that creates the minimum contacts with that state. So you could sue them in any of the 50 states? Well, that's not what happened here. If they said, you might ship it anywhere, and they said, you know, we agree as an addendum. We agree. We will ship it wherever you want, whatever state. You think that's minimal contacts with every state in the country? I think it's contacts with the state they agree and ultimately do ship it to. That's not the case we have here. So we have the four markets, and ZTE Corp. undertook the obligation to ship to any one of those four markets. If after the fact, the client came and said, hey, we've decided, you know, ship them somewhere else. So we're directing you to ship them to Arizona. And ZTE Corp. says, okay, we'll ship them there. But that's not where we agreed to ship them. But as an accommodation to you, we'll do that. We have an agreement here that says four specific locations is where we will agree to ship them if you want us to ship them there. It didn't talk about any of the other 46 states. It talked about these four where the client had specific telephone markets that it was operating. So, and I guess foreseeably, if, you know, depending on the facts, if somebody like ZTE Corp. said, we agree to ship them to any one of the 50 states because you operate in any one of those 50 states and we know that the equipment's going to be implemented in any one of those 50 states, yeah. They have the sufficient context because they're putting the goods out there for use in the local jurisdiction and they have agreed to be a part of that and to have their goods used in that jurisdiction. Yes, I think so, Your Honor. That establishes the minimum context when they agreed to ship to any one of those four locations and ultimately did. I mean, the facts are undisputed that parts of base stations or 64, 65 of the 139 base stations were actually shipped to South Carolina as provided in the addendum to the agreement. So, make it clear to me. I'm trying to understand and understand the questions where we're going. It seems to me there's a jurisdiction question of whether or not the minimum context and the court alternative dismissed because of failed state of claim. Yes. Which one are you talking about? Well, there's a little bit of an overlap, right, because… I understand that, but they are separate determinations. One's an alternative. Sure, sure. If we're dealing with minimum context, I discussed that with you earlier and I thought we went in the direction of saying possibly not all of the evidence was there. So, now we're dealing with the failed state claim? Well, I think the underpinning of the district court's decision that there was not jurisdiction was the fact that it, in our opinion, wrongfully concluded… It wasn't a party. I'm sorry? It wasn't a party to the contract. That it wasn't a party to the contract. And so, it adopted that analysis when it looked at the second question of, have you stated a claim? And if they've said that ZTE Corp. was not a party to the body of agreements that were under consideration, then it can't possibly have… Well, you're not going to be able to make them a party too much to that master supply agreement, are you? Well, I… You've only got two parties in there and your hook line is not one of them. Well, I understand that, Your Honor. And again, you have to look at that again. I don't think you understand it. Are you telling me you agree with that? Well, I understand when I look at the MSA that it indicates that one party is ZTE USA, Inc. and the other party is Daredevil. That's it? Well, I don't think that's it. But I recognize… How do you become a party if you're not named in the contract? I recognize that the typing on the paper says ZTE USA, Inc. and Daredevil. That's kind of informative, isn't it? Well, I agree with this. But you have to also put it in the context of what was that agreement attached to or what was that document attached to. And it was attached to the Missouri Agreement, which consisted of the five pages and was signed by ZTE, Inc. and had all these provisions about what Daredevil is going to do with the manufacturer of the equipment and the developer of the equipment. What happens if you are able to show your part of the other agreement, the Missouri Agreement and the Denon, but not of this master supply agreement? I mean, what's the result of that? If you prevail in saying the party and their minimum of contact, or we at least can go back and look to see if minimum of contact is on these other two, but not on the master supply, what's the end result? The end result, it's concluded as we think it should have been. And look, I will acknowledge that there is a question of fact. Is your case dead? Because if you're not a part of that master supply agreement, is your case dead? Well, not the master. See, I guess we have a different way of looking at it because I don't view the master supply agreement as an agreement standing on its own. It was an attachment to the Missouri Agreement. And, in fact, when you look at the Missouri Agreement, it says, hey, the terms and conditions are attached here too. And they're talking about the MSA. And I think it's really a bit of a misnomer to call that a separate agreement. Because, again, you have to put it in context, and this goes back to the jurisdictional question and doing discovery. I think if it was fleshed out, what you would see is that, hey, the parties met. They hammered out the terms of the Missouri Agreement. But, obviously, when you look at it, it doesn't have all the necessary requirements of a supply agreement for millions of dollars of telecommunications equipment. And so they said, well, let's attach this standard document that has all the terms and conditions, and that will set forth the stuff about doing financing and delivery and submitting purchase orders and all this sort of stuff. And so you have to sort of look at it in context. The MSA is really the terms and conditions of the sale that are attached to the Missouri Agreement. And then you've got the oral agreement that took place in terms of, hey, we're going to refund the money. Now we're not going to refund the money. Now ZTE Corp. says we're going to ship equipment to South Carolina. And then they do the addendum. And, again, clearly, we believe ZTE Corp. was the party to the agreement. At a minimum, it's a question of fact. Which agreement? I'm sorry? Which agreement? I still didn't hear that. Which agreement? The party to agreement. We look at all of the agreements as the agreement, if you want to. I mean, it's a relationship. It starts off with the Missouri Agreement, with the terms and conditions and the MSA attached to it, and then they change it a little bit with an oral agreement, and then they come up with the addendum. It's all part of the package. It starts off with Daredevil and ultimately ends up with PTFLA being the beneficiary of what the party's understanding is and the shipment of goods to South Carolina for use in the South Carolina market for the development of a network in South Carolina. All right. Thank you. Thank you. Schmidt. Thank you, Your Honor. May it please the Court. I'd like to begin with Judge Diaz's question. This is a specific jurisdiction case. That means personal jurisdiction is only proper if this dispute arises out of ZTE Corp.'s alleged contacts with South Carolina. As this Court has put it, the defendant's contacts with the forum state must, quote, form the basis of the suit, and the Supreme Court recently tightened that standard in the Bristol Myers-Wibb case, which we brought to the Court's attention in our 20HA letter. The Court held in that case, even where a defendant has very substantial connections to a forum, if those connections do not themselves give rise to the specific plaintiff's claims, there is no jurisdiction. We think under that principle there's clearly no personal jurisdiction here. It's plain as day on the face of the complaint, this does not allege a breach of contract that has any relationship with South Carolina. I'm just going to read directly from the complaint. This is JA111. Defendant breached the addendum and redeployment agreement by failing to ship complete base stations to Yakima, Washington, on its face that has nothing to do with South Carolina. There are some allegations in the complaint that pertain to South Carolina, but there's no allegation that either of those constitute a breach or that. . . I have one of the allegations that incorporates all those facts in there. Right, so they incorporate the fact that. . . All those facts in there got South Carolina all over. Exactly, and there are some facts that involve South Carolina, but there's. . . 65 stations being in South Carolina. That's correct. The addendum, which was signed by ZTUSA, Inc., and I'll get to that in a moment. And you've got a determination by a district court without an evidentiary hearing. But you still have to make out a prima facie case in order to get to the evidentiary hearing. And to do that, what is the standard? Do you get to look at the evidence in a light favorable? Yes, you do get to look at the evidence. When you get there, you're kind of ahead of a ballgame because my question is, do we have enough here to make that determination? We do, and the reason is the breach of contract claim does not arise out of any contact related to South Carolina. You don't have to take my word for it. This was conceded in district court. I'm going to read directly from the district court's opinion here. This is a JA 360 footnote 29. As ZTE Corp. notes in its opening memorandum, the contract claim does not allege a failure to ship base stations to South Carolina. Plaintiff did not respond to this argument and consequently concedes the point. This court can decide the personal jurisdiction issue on the basis of that concession alone. There was a concession in district court that the breach of contract claim has nothing to do with South Carolina. You're right, Judge Winn, that there are allegations related to South Carolina. But if this claim does not arise out of those allegations or the alleged connections to South Carolina, there's no specific personal jurisdiction. After all, there is also a SCOTPA claim in this case, and those clearly do involve South Carolina, and we think the more natural reading of the complaint is that the SCOTPA claim. We found jurisdiction on that. The district court did find jurisdiction, a prima facie case of jurisdiction on the SCOTPA claim. That's right, and we haven't appealed that, but that's a very different situation because it obviously involves South Carolina and an intentional tort directed at South Carolina. Again, after the district court made this ruling and characterized the complaint in this way, the plaintiff did not move to amend their complaint and make clear that they were actually seeking to recover for any breach related to South Carolina. Even in their motion to alter or amend the judgment, this is at JA 378 to 379, they allege contractual connections to South Carolina but never clearly say that they're seeking to recover for any alleged connection to South Carolina. I think I'll move on to purposeful availment unless the court has any other questions about that issue. The district court found that it was not a party to the agreement. Is that supported? Is that the basis upon which you think we should— That has nothing to do with what we've been talking about for the first few minutes of my argument. So everything I just said— Clear it up in terms of why that's not fundamental in terms of— Because even— You're not a party to the agreement. You're not a party to the agreement. How do you even get personal jurisdiction? And it seems like to me if the district court makes a determination you're not a party to the agreement in a discussion. That's true. Did it not make that determination? It did, but there are alternative bases to dismiss for lack of personal jurisdiction. But how do you deal with that? Because even if you deal with the fact that they're not parties to the agreement, then if you're not a party to the agreement, we don't even get into the rest of it. I mean, why are you even here? That's true. Yeah, no, we agree with that totally. I'm just going through the different alternative bases that you can affirm on. One is that there's no relationship between the breach alleged in South Carolina in this case. How is it not a party to the Missouri agreement? Let's walk through the agreements and just look at the signature pages. How is it not a party to the Missouri agreement? Because if you look at the signature page, they never bound themselves to the terms of the agreement. So I'd like to just walk through the different agreements and clear this up a little bit. The master supply agreement, the signature page is a JA39. It's signed by Joey Jha. Are they separate agreements? They were signed the exact same day. Is it incorporated in the Missouri agreement? So, yes. The terms of the master supply agreement are incorporated into the Missouri agreement. Is that a single agreement or two agreements? I think it's an academic question. I think they're separate agreements. They were signed at the same time. I think it's less academic for me because if you tell me they're all in one agreement and it satisfies one of them, it seems like to me you don't need to show but they're a party to one of the agreements. Then you're a party to both. But if they're two agreements and you're not a party to one of them, you're not a party to one of the other ones, you are a party. So, okay. So is that academic? No, you're right. So we should consider them as separate agreements because the signature pages clearly show that the parties. How did you do that? You just told me it was incorporated. Let me walk through the agreement. I think this will be clear. No, did you not just say it was incorporated? So the Missouri agreement says it incorporates the terms of the master supply agreement. That's correct. And one of the terms of the master supply agreement is that ZTE is defined as ZTE USA, Inc., which means any reference to ZTE in the Missouri agreement refers back to ZTE USA, Inc. And, again, if we just look at the signature page, it's very simple to figure out who's a party to these different agreements. The signature page of the master supply agreement is JA39. It's signed by Joey Jha on behalf of ZTE USA, Inc. The Missouri agreement, the signature page is JA121. That's signed by Joey Jha, again, the same day, on behalf of ZTE, Inc. So they dropped the USA there. There's another pricing provision that comes immediately after that, also signed on the same day, on JA122, signed by Joey Jha on behalf of ZTE USA, Inc. And then the addendum, which my friend on the other side said ZTE Corp. took on an obligation to ship stuff to South Carolina when it signed the addendum. That's what my friend just said. And then if you look at JA125. I thought there were several provisions in there that anticipate performance by ZTE Corporation and not ZTE USA. Are you talking about the Missouri agreement? Yes. So in the Missouri agreement, there is one paragraph at the beginning. It's a kind of preambular paragraph which talks about bridging the cultural gaps between these two different countries. Does it anticipate performance by ZTE Corporation? We don't think so. But, again, the fundamental point. Isn't it that one little paragraph you just read? Well, we think it's not unreasonable that if you have a subsidiary of a foreign corporation, there's still going to be cultural and other barriers that need to be bridged. To anticipate performance by a non-signatory entity to a contract. So that's exactly the point, Judge Winn. Whatever is promised in the agreement, if ZTE… It is reasonable for a contract to have a provision to anticipate performance by a non-signatory to the contract. I'm not sure… Require that non-signatory entity to perform but yet say it's not part of the contract. Is that your statement? So, Your Honor, whether it's reasonable or not, my statement is that two signatories to a contract cannot obligate another party. And this is basic contract law. So I'm going to quote from… You're saying that performance causes nullity. Basically, yes. So let me quote from the Supreme Court. This is the Waffle House case, 534 U.S. 294. It goes without saying that a contract cannot bind a non-party. The South Carolina Court of Appeals has said something very similar. Quote, an individual who is not a party to a contract generally cannot be liable to its breach. So let me put this in more concrete terms. If I enter into a contract with Whole Foods and Whole Foods promises that Amazon is going to send me a book in the mail, I can't go and sue Amazon for breach of contract because it never agreed to that contract. And it doesn't matter that Whole Foods is a subsidiary of Amazon. The point is if you're not a party to the contract, you can't be liable for the breach. And, again, as I was walking through the signature pages… We're not getting a problem when the other side says they are a party to the contract. We don't think so because… You've got this evidence here that indicates you've asked them to perform within the contract. One thing, if everybody all agrees, no, we're not a party to it. But they are a party to the contract. Right. So one other thing I want to clear up. So we think the documentary evidence is very clear. If you look at the signature pages that I was just walking through, we think the documentary evidence is clear that Corp was not a party to the Missouri Agreement. Even if the Missouri Agreement seems to suggest some involvement of ZTE Corp in its performance? Again, right. In that preambular paragraph, we'll concede that there may be that suggestion. But the point is unless ZTE Corp bound itself to that agreement, it can't be liable on the contract. And that contract can't be used to establish minimum contracts. And the other thing I would point out is the only… It's not a question whether or not they want to bind themselves to it. They say we are. We're part of the contract. Who said that? ZTE. Only ZTE USA. Only the subsidiary agreed that they're part of the contract. They say they're a party to the contract. ZTE Corp. Are they a party to the contract? ZTE Corp is not a party to the contract, and they never signed it. And, again, the Missouri Agreement was signed by Joey Jha. This is on JA-129. There's additional evidence. There was an affidavit attached to our initial motion to dismiss. This is a JA-94, which explains that Joey Jha was never an employee, a representative, or an agent of ZTE Corp. So, again, there's no plausible basis to think that ZTE Corp. bound itself to the Missouri Agreement. But, again, if you had any doubt about the Missouri Agreement, the Missouri Agreement, as its name indicates, has nothing to do with South Carolina. This was an agreement to ship stuff to St. Louis. And, ultimately, subsequently, after the parties had a dispute among themselves, it was agreed that part of that equipment would be diverted to South Carolina. And that's what the addendum's about. And that's where my friend said ZTE Corp. took on an obligation to ship stuff to South Carolina when it signed the addendum. And if you look at the addendum, this is at JA-125. That's signed very clearly by ZTE USA, Inc. Again, that's Neil Kushner that signed that agreement. And we don't think there's any plausible allegation that Corp. was a party to that agreement. Why has it got that statement to it that says this document contains proprietary information of ZTE Corporation? Because that was just a footnote on the stationery that was used. And it's not crazy that a subsidiary would have proprietary information of a parent either. We don't think that in any way indicates that it was bound to the agreement. The last thing I would just like to address briefly is this purposeful availment question. My friend on the other side again said that agreeing to ship goods to a state would be a sufficient basis to assert personal jurisdiction. We think that runs headlong into a number of cases, but especially this Court's decision in Chung. Chung was a situation where you had a retailer in Alaska who agreed to sell reindeer antlers to a Virginia resident. The Virginia resident went to Alaska to pick up the goods. They weren't all ready, so the parties agreed that they would ship part of that back to Virginia, directly to the home of the Virginia resident. That shipment occurred. The goods were sent to Virginia, and the Virginia resident sued because the goods had spoiled in transit. There the Court held there was not sufficient basis to assert personal jurisdiction, and the reason that Judge Wilkinson gave in his opinion was that you can't manufacture jurisdiction by the conduct of third parties. And here the only basis for asserting jurisdiction was that one of the parties to the contract wanted the goods shipped to Virginia, and that was not a sufficient basis. And the other thing I would add, Your Honor, is that that case very clearly arose out of the spoiling of the goods that were themselves shipped from Alaska to Virginia. Here, again, you don't have any allegation that this dispute arose out of any shipment to South Carolina, and that was conceded in the district court in the passage that. That case is a little different. You've got a case in which they were requesting, they requested to make this order, and they told them we don't do business outside of Alaska. So, Your Honor, that's certainly different.  He's not in your state. Fair enough, Your Honor. So that's a single case. Let me quote from Justice Breyer and Justice Alito's concurrence, their narrow concurrence. In the Chung case? Excuse me? You don't mean you're moving from that case now to another case? First of all, we think the principle of Chung applies here. So I was discussing Chung before. I was about to quote from the Supreme Court's recent decision in the Castro personal jurisdiction case. But let me just explain. Let me wrap up Chung. I think Chung stands for the proposition that accommodating a customer's wishes is not enough to show purposeful availment of a forum and that you can't manufacture jurisdiction through the behavior of a third party. And here we have a very similar situation where you had a sale of goods that was consummated in the Missouri agreement. That sale, those goods were intended to go to St. Louis, and what you had was that PTA or Daredevil or one of these affiliates then decided they would I'm disagreeing with you in the application of Chung. I'm just saying that it's not a strong case. You say it is if you take it from the perspective of the question. They said, no, we don't do business there, and it's a one-time relationship. Sure. It's not as strong of a case as you get. Not as strong as a case. But, again, so let me move on to the Castro. Let me ask. So if, in fact, this diversion of goods into South Carolina had been properly planned as a breach of contract, are you saying that that by itself still would not be enough under this purpose? We are. Okay. We are, Your Honor, because we think that single isolated shipment, after it had already been paid for, the direction of a third party is not enough to show purposeful availment. Right. And, of course, in this case, it isn't even clear that that was alleged as a breach of contract. We think it's clear that it was not. And the other thing I would say is sometimes you see cases suggesting that just being party to a contract can be enough to show purposeful availment of a forum. I'm thinking of the Burger King case or something like that. But in those circumstances, what you're looking for is a contract that has a substantial connection to the forum. And here, the only contract that has any connection whatsoever to the forum is the addendum, which only recognizes that 65 base stations had already been diverted and is not even signed by ZTE Corp. Burger King, you had a franchise agreement with 20 years of continuing obligations towards Florida, and the Court 7-2 held that that was sufficient. But we think this is a far, far cry from that. I can address the SCPPA claims briefly if the bench has any questions. But opposing counsel didn't raise it, so. You probably don't have to worry too much. Okay. I think that's it. Thank you, counsel. Thank you. Mr. Gallagher. Thank you. It's as clear as mud to us all. Thank you. I think you need to clarify some points made by the opposing counsel insofar as whether you're a party to the contract, the import, or whether being a party is of significance here, and the minimum contracts in terms of whether the contract itself is sufficient to allege the jurisdiction of the addendum. So maybe a lot, but. Yeah. But I think there's sort of a mixed bag of facts out there, and you've pointed out some of the ones that we've raised in our brief, both for and some of the ones that they've raised against. We believe when you look at the documents that are before the court presently, or that were before the district court at the time, if you consider the testimony of the parties who were involved in the transaction, if you looked at the totality of the circumstances that were present at the time at the various points along the way, in September of 2008 when the Missouri Agreement was executed, and again, you put it in the context of an affiliate of Daredevil had just gone through a relationship with ZTE when it purchased and installed a network down in Jacksonville, Florida. That was a contract that had been entered into in 2006. Because of the difficulties associated with that, it was important to Daredevil, which was an affiliate of PTFLA, to make sure that it wasn't dealing with just a sales arm of some company that couldn't address what its real problems were in terms of getting over-the-air functionality and E911 and local number portability and all those sorts of things. And these are things that didn't come out in connection with the hearing on the motion to dismiss because there wasn't an evidentiary hearing, there was no discovery that was permitted leading up to it. But I can represent to the court that it was important to Daredevil and the development manager of Daredevil, who was Eric Steinman, who was also the development manager of PTFLA, to have the responsible party, the manufacturer of the goods, on the other end of the contract so that he knew and the company knew that it could have these problems addressed, that the companies would work together, they would bridge the cultural divide, that they would do development together, things like that. All these things that ZTE USA could not do and had proved incapable of doing when the parties had previously dealt with one another down in Florida. So you have to look at what went on in September of 2008 when they signed the Missouri Agreement and they attached the MSA with the terms and conditions to it. You have to look at what went on in April of 2009 when the parties met, including the chief executive of ZTE Corp, in order to address the problems with the contract and how are we going to solve this thing. And you need to look at what were the circumstances surrounding and the events that led up to the execution of the addendum, which included the prior shipment of 65 base stations to South Carolina and the anticipation that additional base stations would be shipped there for the implementation of a network that PTFLA was developing there. Again, it's a mixed bag. Because you've got the document upon which the addendum was entered into, it says this is the proprietary information of ZTE Corp. You've got ZTE Inc. signing off on the Missouri Agreement. You've got the head guy from ZTE Corp. at the meeting in April of 2009. And all these are on top of the fundamental belief of the customer, which is I want to deal with the parent company, the one who's manufacturing these goods, so that I know that I can work with them and get exactly what it is that I'm looking for. As I said, it's a mixed bag, but at the same time, at a minimum, it's a question of fact about who the parties to the contract were. And obviously, they contend the party was ZTE USA. When we look, I think as Judge Winn has pointed out, there's an incorporation provision in the Missouri Agreement that says, hey, the terms of that agreement are incorporated herein. It also provides that to the extent of any conflict, that the terms of the Missouri Agreement are going to prevail over the terms and conditions that are set forth in the MSA, which arguably includes who the signatory party is. And I think what we saw or experienced a little bit in the District Court is that there was a certain amount of maybe cherry-picking of facts to suit a conclusion, which is court concludes ZTE USA is the party, and so it ignores, in fact, there's no discussion of, hey, this document was on ZTE Corp, I don't want to say letterhead, but property that was property of ZTE Corp. It's signed by ZTE Inc. I think there was sort of a rush to support the conclusion that was reached and not a balance in the facts. And again, at a minimum, there should have been an evidentiary hearing. But in the absence of that, the court should have resolved any of these factual inconsistencies in the favor of PTA-FLA, and it didn't. It went completely the opposite way and said, we're evaluating all this stuff and we're ruling in ZTE Corp's favor in this instance. Anyway, I don't know if the court has any more questions. Thank you.
judges: Roger L. Gregory, James A. Wynn Jr., Albert Diaz